Frank W. McINTYRE, Appellant

v.

THE COMMISSION FOR LAWYER DISCIPLINE, Appellee.

No. 05–06–00580–CV.

Court of Appeals of Texas, Dallas.

March 6, 2008.

Frank W. McIntyre, Dallas, TX, pro se.

DeAnne Claire, Dallas, and Linda Acevedo, Office of Chief Disciplinary Counsel, Austin, for Appellee.

Before Justices MORRIS, FRANCIS, and LANG–MIERS.

## OPINION

Opinion by Justice LANG–MIERS.

Appellant Frank W. McIntyre appeals the trial court's judgment disbarring him as an attorney in Texas. McIntyre contends that the trial court erred in rendering this judgment and raises eight issues on appeal complaining about (1) the denial of his motion for judgment notwithstanding the verdict, (2) certain rulings by the trial court concerning McIntyre's testimony, (3) the jury charge, and (4) the findings that he violated disciplinary rules despite the lack of expert testimony to rebut McIntyre's expert. We affirm the judgment of the trial court and publish this opinion in accordance with Texas Rule of Disciplinary Procedure 6.06. TEX.R. DISCIPLINARY P. 6.06, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A–1 (Vernon 2005).

## FACTUAL AND PROCEDURAL BACKGROUND

This disciplinary proceeding arose from McIntyre's representation of Elizabeth Zedaran in a post-divorce-decree proceeding against her ex-husband, James Infinger. Back when the divorce petition was pending, Infinger was asked to estimate the couple's 1999 federal income taxes and to deposit that amount into the registry of the court, which he did. The trial court signed the final decree in the Zedaran/Infinger divorce in December 2000. That decree awards Infinger "[t]he sum of $34,239.00 held in the registry of the 303rd Judicial District Court of Dallas County, Texas, subject to the use as described in 'Federal Income Tax' as set forth herein below." The "Federal Income Tax" section of the decree states, in part, as follows:

IT IS ORDERED AND DECREED that JAMES INFINGER and ELIZABETH ZEDARAN shall file a joint tax return for the calendar year 1999. IT IS FURTHER ORDERED that JAMES INFINGER shall be solely responsible for all federal income tax liabilities of the parties for the calendar year 1999, and shall timely pay any deficiencies, assessments, penalties, or interest due thereon and shall indemnify and hold ELIZABETH ZEDARAN and her property harmless therefrom. IT IS FURTHER ORDERED that JAMES INFINGER shall pay the parties' 1999 federal income tax liability from the funds held in the registry of the Court awarded to JAMES INFINGER herein

above. IT IS FURTHER ORDERED that in the event the parties' 1999 federal income tax liability is less than $34,239.00, JAMES INFINGER shall pay to ELIZABETH ZEDARAN one-half (1/2) of any and all funds remaining after payment of the parties' 1999 federal income tax liability.

IT IS ORDERED AND DECREED that a Certified Public Accountant shall prepare the parties' 1999 income tax return.

IT IS ORDERED AND DECREED that each party shall furnish such information to the other party as is requested to prepare the 1999 joint federal income tax return within fifteen (15) days of receipt of written request for the information.

IT IS ORDERED AND DECREED that both parties shall cooperate in the preparation of a joint tax return for 1999. Both parties are ORDERED to provide the information to a preparer within ten days of any request for the information.

The funds in the registry of the court were not transferred to Infinger and the taxes remained unpaid for years.

According to McIntyre's testimony, Zedaran hired him in March or April 2003 to "enforce certain aspects of the decree" and also to "obtain some modifications to that divorce decree." After reviewing Zedaran's file, McIntyre decided to first address the issue of the couple's unpaid 1999 income taxes:

[O]ne of the first things I did after reading through the file, getting acquainted with the file, is, I was looking for any one issue, any issues we could get out of the way quick. And getting

the taxes paid appeared to be pretty easy because the divorce decree said, James Infinger shall pay the taxes. Elizabeth and James Infinger shall file a joint tax return and have a joint tax return prepared by an accountant and they are to both sign and file it.

The money that was in the registry of the Court is to be used to pay part of it. Then, there was, obviously—the divorce decree itself was silent as to, you know, the timing of paying any deficit balance, okay. But the implication of the language in that decree was that, we get the money out of the registry of the Court, we get the signed tax returns, and we get James Infinger's check for the balance of the taxes, pack it all up, send it to the IRS. Issue over, okay.

To address the issue of the unpaid taxes, McIntyre contacted Infinger's counsel, Reyburn Anderson. The order they agreed to submit was signed by the court on May 23, 2003, and states:

The Clerk is ordered to issue a check made payable to the United States Treasury Department in the amount of twenty eight thousand two hundred and forty seven dollars and thirty eight cents ($ 28,247.38)[1] out of funds held in the registry of the court. The check should reflect that it is for payment of the 1999 income taxes for Elizabeth Zedaran and James Infinger. The check is to be delivered to Frank McIntyre, counsel for Elizabeth Zedaran. Frank McIntyre is ordered to forward the check to the United States Treasury Department along with all such documentation as is required to show that it is for payment of the 1999 income taxes of Elizabeth Zedaran and James Infinger.

1. The record does not reflect why the amount of funds in the agreed order is less than the amount reflected in the decree.

At the bottom of that order there is a notation indicating that the registrar issued the check on June 11, 2003. McIntyre testified that on June 20, 2003, he sent a letter to Anderson stating,

I have the check from the Clerk of the Court in the amount of $ 28, 247.38. Please send me a copy of the 1999 tax return with your client's signature, along with his check for the balance due after applying the check I have in hand; and I will send everything to the IRS.

After that, according to McIntyre, "the other side refused to send [him] the check" and did not send him a copy of the tax return he requested.

McIntyre testified that he did not forward the check to the IRS because he "felt at that time that what [he] had in [his] possession was only one of the three necessary items." Specifically, McIntyre testified:

I had the check from the registry of the Court. I did not have the joint tax return signed by both parties. I did not have a check for the balance of the taxes from Mr. Infinger. Further—and so I went back and forth with Mr. Anderson for a period of time, several months, actually, on and off, while we were dealing with other issues in the case. And throughout that time they made demands on me to send the check and I made responses that I'm not sending the check without the other documents that's [sic] required, that I believe, under my interpretation of the agreements we have reached, are required, under my interpretation—and under my interpretation of the order and under my interpretation of the divorce decree, reading the order and the divorce decree together.

Infinger testified that he discovered the check had not been sent to the IRS because his debit card was declined. When he called his bank, he was told that "the IRS had taken all the money out of [his] account." Infinger then called the IRS and was told that the couple's outstanding principal tax liability at that point was $57,666, and with interest and penalties, "it was now at about eighty-five or $90,000." The IRS agreed to "hold any legal actions" until Infinger and Zedaran resolved their dispute about the outstanding tax liability. Infinger testified that a joint tax return was prepared and that he sent it to Zedaran. Infinger also testified that it was his position that his obligation to pay the couple's 1999 taxes "was limited to the funds that were in the court registry."

Infinger sent two letters to McIntyre, one on October 13, 2003, and another on February 13, 2004, in which he informed McIntyre that because of McIntyre's refusal to send the check to the IRS, Infinger was "filing a grievance" "with the State Bar of Texas." In his first letter, Infinger also informed McIntyre that he sent Zedaran a joint tax return for her signature and asked McIntyre to include Infinger's and Zedaran's social security numbers when forwarding the check to the IRS. In his second letter, Infinger gave McIntyre a deadline of February 20, 2004.

On February 24, 2004, McIntyre sent a letter to Anderson in which he acknowledged receipt of Infinger's second letter and proposed to address the impasse concerning payment of the 1999 taxes by returning the check to the court and having two new checks issued to Infinger and Zedaran:

I have recently received correspondence directly from your client. As you know, I am not permitted to communicate directly with him without your consent. Furthermore, I would prefer not to. Nevertheless, his letter raises an issue that needs to be addressed.

Last summer we entered into an agreed order under which I was to take charge of a check issued by the Registry of the Court made payable to the IRS in the approximate amount of $28,000. The check was to be forwarded to the IRS along with signed tax returns and your client's check for the balance of the amount due under the joint tax return [which] the Court ordered your client to pay under the Final Decree of Divorce entered in the above referenced matter. Your client's failure to pay those taxes when they originally came due has resulted in such substantial additional taxes and penalties that it is not reasonable to now request my client to share in those taxes and penalties. My client has protected herself by filing a separate tax return for the year or years involved. Although she has filed the separate return, she still owes taxes based on the separate income.

Since your client is apparently unwilling to pay the taxes he was ordered to pay and the continuing accrual of additional taxes and penalties harms both our clients, I propose that I simply return the check to the registry of the court and have the trustee issue new checks to each of our clients. The amount of the new checks will be exactly one half the amount of the original check.

If this proposal is agreeable to your client, please indicate your agreement by signing this letter in the signature block below.

Infinger filed a complaint with the Commission for Lawyer Discipline in March 2004. Five months later, Zedaran filed a motion to amend the agreed order,[2] in-

forming the court that the check had not been forwarded to the IRS because "Infinger breached the [parties'] agreement by refusing to provide McIntyre a copy of the signed tax return or the check for the balance of the taxes due." On November 16, 2004, the Commission filed a disciplinary petition against McIntyre, in which it identified Infinger as the complainant, recited the language of the May 23, 2003 agreed order, and accused McIntyre of violating Texas Disciplinary Rules of Professional Conduct 1.01(b)(2), 1.14(b), and 3.04(d).

McIntyre's disciplinary proceeding was tried to a jury. The judge who issued the May 23, 2003 agreed order testified during the proceeding that her order was clear and unambiguous. She also testified that what she meant by "documentation" was "some identifier so that the United States Treasury Department, what I call the IRS, would apply that towards these people's '99 taxes." She also testified that she would consider the agreed order to be an order to enforce a divorce decree, but that if her order was inconsistent with the terms of the prior decree, she would "expect the order to be followed." But she also agreed on cross-examination that there was "room for . . . reasonable minds to differ as to the meaning of 'all such documentation'" and that "a tax return could be one of the required documents, along with others."

After they deliberated, the jury answered "no" to the question of whether McIntyre violated Texas Disciplinary Rule of Professional Conduct 1.01(b)(2),[3] but answered "yes" to the questions of whether McIntyre violated Texas Disciplinary

---

2. Zedaran was represented by different counsel when she filed her motion to amend the agreed order.

3. Rule 1.01(b)(2) states: "In representing a client, a lawyer shall not [ ] frequently fail to carry out completely the obligations that the lawyer owes to a client or clients." TEX. DISCIPLINARY R. PROF'L CONDUCT 1.01(b)(2).

Rules of Professional Conduct 1.14(b) [4] and 3.04(d).[5] The trial court conducted a sanctions hearing under Texas Rule of Disciplinary Procedure 3.10, in which the court heard evidence concerning McIntyre's past disciplinary proceedings in addition to further testimony about his conduct concerning the check. At the conclusion of that hearing, the court found that McIntyre committed professional misconduct as defined by Texas Rule of Disciplinary Procedure 1.06 and ordered that McIntyre be immediately disbarred. McIntyre filed a motion for judgment notwithstanding the verdict, which the trial court denied. This appeal followed.

### ANALYSIS

McIntyre's eight issues fall into four general categories. We address his issues by category, rather than in numerical order.

## A. Issue Concerning McIntyre's Duty

### First Issue

■ In his first issue, McIntyre asks this Court whether he had "a duty to forward the check to the IRS without his client's consent, without 'all such documentation as is required to show that it is for payment of the 1999 income taxes of Elizabeth Zedaran and James Infinger,' and while the [May 23, 2003] Order was the subject of open dispute between the par-

ties affected by it." We interpret this as a legal-sufficiency challenge, arguing that the trial court erred in denying McIntyre's motion for judgment notwithstanding the verdict (jnov).

■ A jnov is proper when a directed verdict would have been proper. TEX.R. CIV. P. 301; *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex. 1991). A motion for jnov should be granted when (1) the evidence is conclusive and one party is entitled to recover as a matter of law or (2) a legal principle precludes recovery. *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990); *Kupchynsky v. Nardiello,* 230 S.W.3d 685, 688 (Tex. App.-Dallas 2007, pet. filed). We review the denial of a motion for jnov under a legal-sufficiency standard. *County of Dallas v. Wiland,* 124 S.W.3d 390, 401 (Tex. App.-Dallas 2003), *rev'd on other grounds,* 216 S.W.3d 344 (Tex.2007).

In a legal-sufficiency review, we look at all of the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). To give appropriate deference to the fact-finder's conclusions and the role of a court conducting a legal-sufficiency review, looking at the evidence in the light most favorable to the finding means that a reviewing court must assume that the fact-finder re-

---

4. Rule 1.14(b) states: "Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property." TEX. DISCIPLINARY R. PROF'L CONDUCT 1.14(b).

5. Rule 3.04(d) states that "A lawyer shall not [ ] knowingly disobey, or advise the client to disobey, an obligation under the standing rules of or a ruling by a tribunal except for an open refusal based either on an assertion that no valid obligation exists or on the client's willingness to accept any sanctions arising from such disobedience." TEX. DISCIPLINARY R. PROF'L CONDUCT 3.04(d).

solved disputed facts in favor of its finding if a reasonable fact-finder could do so. *Id.* A corollary to this requirement is that a court should disregard all evidence that a reasonable fact-finder could have disbelieved or found to have not been credible. *Id.*

Looking at it with that perspective, we note that the evidence included the agreed order itself and the testimony of two judges that they would have expected, based on the language of the order, for the check to be forwarded. The evidence is legally sufficient to support the finding that McIntyre had a duty to forward the check to the IRS. We overrule McIntyre's first issue.

### B. Issues Concerning McIntyre's Testimony

 McIntyre's fifth and seventh issues relate to the trial court's rulings that did not allow him to read certain comments to the Texas Disciplinary Rules of Professional Conduct as part of his testimony. The admission or exclusion of evidence rests within the sound discretion of the trial court. *K–Mart Corp. v. Honeycutt,* 24 S.W.3d 357, 360 (Tex.2000) (per curiam). We will not disturb the trial court's ruling absent an abuse of discre-

tion. *Id.* To reverse an erroneous evidentiary ruling, an appellant must not only establish error, but also show that the error probably caused the rendition of an improper judgment. TEX.R.APP. P. 44.1; *Wal–Mart Stores, Inc. v. Johnson,* 106 S.W.3d 718, 723 (Tex.2003). We must examine the record to determine whether the excluded evidence was controlling on a material issue and not cumulative of other evidence. *See Williams Distrib. Co. v. Franklin,* 898 S.W.2d 816, 817 (Tex.1995) (per curiam).

### Fifth Issue

In his fifth issue, McIntyre argues that the trial court erred because it did not allow him to read comment six and the first half of comment seven [6] to rule 3.04 to the jury during his direct testimony. The record, however, expressly contradicts McIntyre's argument. McIntyre read all of comment six and the first half of comment seven to the jury during his direct testimony, verbatim, and without drawing an objection. We overrule McIntyre's fifth issue.

### Seventh Issue

 In his seventh issue, McIntyre argues that the trial court erred because it did not allow him to read [7] comment 3 to

---

**6.** In his appellant's brief, McIntyre states that he "sought to read comments six and seven." But during oral argument, McIntyre conceded that the only portion of comment seven that he believes is relevant is the first half of the comment, describing an exception in the event of an "open refusal based on an assertion that no valid obligation exists." McIntyre agrees that the second half of the comment, describing an exception in the event that a lawyer "acquiesce[s] in a client's position that the sanctions arising from noncompliance are preferable to the costs of compliance" does not apply in this case because it is undisputed that Zedaran was not aware of the agreed order.

**7.** McIntyre was not allowed to read comment 3 because the trial court sustained the Commission's objection "to counsel attempting to instruct the jury on the law." The trial court explained the basis for its ruling as follows:

My ruling for the record, on the reading of the commentary is that the objection is sustained. While you are testifying, you can give your belief, you can summarize your opinion which can be the exact same thing that is in the commentary, but don't just read the opinion to the jury.... But don't just read-don't just keep reading to the jury as part of your testimony.

\* \* \*

You are the respondent. Obviously, you are giving them your opinion as to whether or

rule 1.14[8] to the jury. That comment states:

> Third parties, such as client's creditors, may have just claims against funds or other property in a lawyer's custody. A lawyer may have a duty under applicable law to protect such third-party claims against wrongful interference *by the client*, and accordingly, may refuse to surrender the property *to the client*. However, a lawyer should not unilaterally assume to arbitrate a dispute between the client and the third party.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.14 cmt. 3 (emphasis added). Although McIntyre was not permitted to read the text of the comment to the jury, he was permitted to testify as to the substance of that comment:

> Okay. Well, under the comments to [rule 1.14], the lawyer is under a duty to protect these other third parties from having their interest in this check interfered with. He can't simply give the check to the client and say, I relied on my client to pay the bills ...

> \* \* \*

> talking about the duty of the attorney to protect the interests of the third party, the attorney is privileged to hold on to the check until the-until all the disputes—actually, not privileged. I shouldn't say privileged. He is obligated under the rule.

McIntyre has not demonstrated that the comment was controlling on a material issue because it is undisputed that McIntyre's client did not ask him to turn the check over to her. Additionally, reading comment 3 itself would have been cumula-

tive of McIntyre's testimony. Consequently, we conclude that the trial court did not abuse its discretion by refusing to let McIntyre read comment 3. *See Williams Distrib. Co.*, 898 S.W.2d at 817 (trial court does not abuse its discretion by excluding evidence that is cumulative of other evidence or is not controlling on material issue). We overrule McIntyre's seventh issue.

## C. Issues Concerning the Jury Charge

 McIntyre's second, third, fourth, and sixth issues relate to the jury charge. We review these issues under an abuse-of-discretion standard. *Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 653 (Tex.App.-Dallas 2002, pet. denied); *Toles v. Toles*, 45 S.W.3d 252, 263 (Tex.App.-Dallas 2001, pet. denied). The trial court has broad discretion in submitting jury questions so long as the questions submitted fairly place the disputed issues before the jury. *Rosell*, 89 S.W.3d at 653; *Toles*, 45 S.W.3d at 263. Controlling issues of fact must be submitted to the jury and may be submitted to the jury by questions, instructions, definitions, or through a combination of them. *Rosell*, 89 S.W.3d at 653; *Wright Way Constr. Co. v. Harlingen Mall Co.*, 799 S.W.2d 415, 422 (Tex.App.-Corpus Christi · 1990, writ denied) (op. on reh'g). A trial court is afforded more discretion when submitting instructions than when submitting questions as part of the jury charge. *Rosell*, 89 S.W.3d at 653; *Wal–Mart Stores, Inc. v. Middleton*, 982 S.W.2d 468, 470 (Tex. App.-San Antonio 1998, pet. denied).

 To preserve a complaint about jury-charge error for appeal, an appellant

---

not you violated a rule. You can certainly do that.

8. McIntyre actually argues that the trial court erred by not allowing him to read "the com-

ments to Rule 1.14." But the only comment to Rule 1.14 referenced in McIntyre's brief is comment 3. We limit our consideration of this issue to that comment.

is required to timely object and make the trial court aware of its complaint concerning the jury charge. *See* Tex.R. Civ. P. 272, 274. An incorrect jury instruction is grounds for reversal only if it likely caused the rendition of an improper verdict. Tex. R.App. P. 44.1(a); *Union Pac. R.R. Co. v. Williams,* 85 S.W.3d 162, 166 (Tex.2002).

## Second Issue

In his second issue, McIntyre asks this Court:

[whether] the United States Treasury Department and the IRS [are] 'third persons' within the meaning of Rule 1.14(b), thus giving rise to a duty by McIntyre to notify them of the check or the money in the registry of the court while there was still an ongoing dispute over the 1999 tax returns of Elizabeth Zedaran and James Infinger[.]

McIntyre argues that "[t]here no are [sic] disputed fact issues to be resolved regarding the alleged Rule 1.14.(b) violation. The jury's answer to the Rule 1.14(b) question is immaterial because the sole issue is a pure question of law." McIntyre then argues that this question of law should have been resolved in his favor. We construe McIntyre's second issue to argue jury-charge error. In response, the Commission argues that the jury was properly instructed that the IRS is a "third person" and that McIntyre has not preserved this issue for review because McIntyre did not object to that instruction during the jury charge conference. We agree.

McIntyre did not object to the question concerning whether he violated rule 1.14(b) or to the corresponding instruction that the treasury department and IRS are third parties. Instead, McIntyre stated "I'm okay with [it]." Consequently, McIntyre has not preserved this issue for appellate review. *See* Tex.R. Civ. P. 272, 274; Tex.R.App. P. 33.1; *State Dep't of High-*

*ways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992). We overrule McIntyre's second issue.

## Third Issue

In his third issue, McIntyre contends that the jury charge was incomplete as it related to the following question the trial court submitted to the jury:

Do you find that Frank W. McIntyre knowingly disobeyed a ruling of a tribunal when he failed to forward the $28,247.38 check drawn from the registry of the court, to the United States Treasury Department for payment of Infinger and Z[e]daran's IRS tax bill under Texas Disciplinary Rule of Professional Conduct 3.04(d)?

Rule 3.04(d) provides: A lawyer shall not knowingly disobey, or advise the client to disobey, an obligation under the standing rules of or a ruling by a tribunal except for an open refusal based either on an assertion that no valid obligation exists or on the client's willingness to accept any sanctions arising from such disobedience.

McIntyre argues that the jury charge was incomplete because the trial court did not also submit the following two questions to the jury: (1) "Did James Infinger and Elizabeth Zedaran have conflicting claims or interests regarding the disposition of the IRS check that is the subject of this lawsuit?" and (2) "Did Frank McIntyre openly acknowledge his refusal to forward the check to the IRS?"

In response, the Commission first argues that McIntyre did not preserve this issue for appellate review because, during the charge conference, he "did not specifically object to the above question [concerning rule 3.04(d) ] as submitted." Alternatively, the Commission argues that the trial court did not err in refusing to submit those two questions to the jury

because they were superfluous and not in substantially correct form. The Commission argues that they were superfluous because "presumably McIntyre submitted these questions for the purpose of determining that his conduct in disobeying the court's order fell within the exception to the rule," and "the jury was properly instructed as to the exceptions by having been provided the text of the rule." The Commission also argues that the requested questions were not in substantially correct form because "[n]either of McIntyre's proposed questions tracks the language of the exception[s] to [r]ule 3.04(d)."

We agree with the Commission that McIntyre's requested questions were not in substantially correct wording, as required by Texas Rule of Civil Procedure 278. TEX.R. CIV. P. 278 ("Failure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, *in substantially correct wording*, has been requested in writing") (emphasis added); *see also Bellino v. Comm'n for Lawyer Discipline*, 124 S.W.3d 380, 385 (Tex.App.-Dallas 2003, pet. denied) (citing *Borneman v. Steak & Ale of Tex., Inc.*, 22 S.W.3d 411, 413 (Tex.2000) and *O'Quinn v. State Bar of Tex.*, 763 S.W.2d 397, 399 (Tex.1988)) (jury charge for cause of action under Texas Disciplinary Rules of

Professional Conduct should track language of those rules "as closely as possible"). We overrule McIntyre's third issue.

**Fourth Issue**

■ McIntyre's fourth issue includes two sub-issues. First, McIntyre argues that the trial court erred because it refused to submit comments 6 [9] and 7 [10] to rule 3.04 as "clarifying instructions" in the jury charge. In response, the Commission argues that the trial court correctly exercised its discretion in refusing to include comments 6 and 7 to rule 3.04 because those comments describe the exceptions to rule 3.04(d) and those same exceptions are described in the rule itself, which was included in the jury charge. The Commission also argues that "McIntyre has not shown how the exclusion of these comments probably caused the jury to render an improper verdict." We agree. *See* TEX.R.APP. P. 44.1(a); *Williams*, 85 S.W.3d at 166.

■ Second, McIntyre argues that the trial court erred because it did not submit the following instruction in the jury charge:

> When considering the Rules, as when considering statutes, the appellate court should look to the entire Rule rather than to one phrase, clause or sentence.

---

9. McIntyre's proposed instruction concerning comment 6 reads:

> Paragraph (d) prohibits the practice or [sic] a lawyer not disclosing a client's actual or intended non-compliance with a standing rule or particular ruling of an adjudicatory body or other official to other concerned entities. It provides instead that a lawyer must openly acknowledge the clients [sic] non-compliance.

10. McIntyre's proposed instruction concerning comment 7 reads:

> Paragraph (d) also prohibits a lawyer from disobeying, or advising a client to disobey, any such obligations unless either of two

circumstances exists. The fist [sic] is the lawyers [sic] open refusal based on an assertion that no valid obligation exists. In order to assure due regard for formal rulings and standing rules of practice or procedure, the lawyers [sic] assertion in this regard should be based on a reasonable belief. The second circumstance is that a lawyer may acquiesce in a client's position that the sanctions arising from noncompliance are preferable to the costs of compliance. [Example omitted]. A lawyer should consult with a client about the likely consequences of any such act of disobedience should the client be inclined to pursue that course; but the final decision in that regard rests with the client.

One provision or part should not be given meaning or construction out of harmony for inconsistent with the other provisions. *Hawkins v. Commission for Lawyer Discipline*, 988 S.W.2d 927, 932 (Tex.App.-El Paso 1999, pet. denied). McIntyre does not contend, and the record does not reflect, that he actually requested this instruction and obtained a ruling. Consequently, McIntyre has not preserved this issue for appellate review. *See* TEX.R. CIV. P. 272, 274; TEX.R.APP. P. 33.1. We overrule McIntyre's fourth issue.

**Sixth Issue**

McIntyre's sixth issue includes two sub-issues. First, McIntyre argues that the trial court erred because it refused to include comment 3 to rule 1.14 in the jury charge.[11] In response, the Commission argues that "the comment was essentially included" in the following instruction that was submitted to the jury:

> In answering [the question of whether McIntyre violated rule 1.14(b) ] you are instructed that a lawyer should hold property of others with the care required of a professional fiduciary. *You are further instructed that third parties such as a client's creditors, may have just claims against the funds in the lawyer's custody, however, a lawyer should not unilaterally assume to arbitrate a dispute between the client and the third party.* You are further instructed that [the] United States Treasury Department and the IRS are properly deemed as "third persons."

(Emphasis added.) We agree with the Commission. Additionally, comment 3

does not apply to the particular facts of this case because it addresses a lawyer's duty to protect third parties from wrongful interference by the client and it is undisputed that McIntyre's client did not ask him to turn the check over to her. As a result, the omission of comment 3 did not likely cause the rendition of an improper verdict. *See* TEX.R.APP. P. 44.1(a); *Williams*, 85 S.W.3d at 166.

Second, McIntyre argues that the trial court erred because it refused to submit the instruction to the jury that "McIntyre was permitted to hold the IRS check until all good faith disputes relating to the delivery of the check were resolved either by agreement of the parties or by further order of the court." We disagree.

When a trial court refuses to submit a requested instruction, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex.2000) (per curiam). Further, for an instruction to be proper, it must (1) assist the jury; (2) accurately state the law; and (3) find support in the pleadings and the evidence. TEX.R. CIV. P. 278 ("Failure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested"); *Mandlbauer*, 34 S.W.3d at 912.

McIntyre does not cite any authority to show that his proposed instruction accurately stated the law or to support his

---

11. Comment 3 reads:
 Third parties, such as client's creditors, may have just claims against funds or other property in a lawyer's custody. A lawyer may have a duty under applicable law to protect such third-party claims against wrongful interference by the client, and ac-
 cordingly, may refuse to surrender the property to the client. However, a lawyer should not unilaterally assume to arbitrate a dispute between the client and the third party.
 TEX. DISCIPLINARY R. PROF'L CONDUCT 1.14 cmt. 3.

conclusory statement in his brief that "the jury was prevented from receiving the valid instruction that McIntyre's proper course of action under the circumstances was to hold the check until all disputes surrounding it were resolved either by agreement of the parties or further order of the court." We overrule McIntyre's sixth issue.

### D. Issue Concerning Expert Testimony

**Eighth Issue**

■ In his eighth issue, McIntyre argues that because he presented expert testimony to support his defense, and the Commission did not present any rebuttal expert testimony, his expert's testimony was "uncontroverted" and "the trial court could not have found that McIntyre violated any disciplinary rules." To support his argument, McIntyre cites cases, including *Cosgrove v. Grimes*, 774 S.W.2d 662 (Tex. 1989), in which courts have stated that expert testimony is required to establish the standard of care when lawyers are accused of legal malpractice by their clients. The Commission argues that no expert testimony is required to establish a violation of the disciplinary rules.

McIntyre does not cite any authority, and we have found none, stating that rebuttal expert testimony is required in a disciplinary proceeding against a lawyer. Instead, this Court has held that "[i]nterpretation of the disciplinary rules is a question of law for the trial court, and therefore expert testimony is not required." *Goldstein v. Comm'n for Lawyer Discipline*, 109 S.W.3d 810, 815 (Tex.App.-Dallas 2003, pet. denied); *see also Acevedo v. Comm'n For Lawyer Discipline*, 131 S.W.3d 99, 107 (Tex.App.-San Antonio 2004, pet. denied) (citing *Hawkins v. Comm'n for Lawyer Discipline*, 988 S.W.2d 927, 936 (Tex.App.-El Paso 1999,

pet. denied)) (attorney disciplinary action is "not an attorney malpractice case where the standard of care is at issue. Rather, [it] is a disciplinary proceeding where the appropriate interpretation of the Rules of Conduct and a factual determination of whether [the attorney's] conduct met or violated the Rules is at issue"). We overrule McIntyre's eighth issue.

### Conclusion

We overrule McIntyre's eight issues and affirm the judgment of the trial court.